# UNITED STATES DISTRICT COURT

_____SOUTHERN_____ DISTRICT OF ____CALIFORNIA____    FILED

In the Matter of the Search of

2007 NOV 14  AM 11: 19

Dell Dimension E521 desktop computer        **SEARCH WARRANT** CLERK US DISTRICT COURT
Serial Number: HWC16C1                                SOUTHERN DISTRICT OF CALIFORNIA

CASE NUMBER: **07 MJ 2654**

TO: __Jodi A. Jewett_____ and any Authorized Officer of the United States

Affidavit having been made before me by Jodi A. Jewett who has reason to believe that on the premises known as

See Attachment "A"

in the Southern District of California there is now concealed a certain person or property namely

See Attachment "B"

I am satisfied that the affidavit and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant based on alleged violations of: (1) Title 18, United States Code, Section 2251, production of child pornography as it relates to interstate or foreign commerce; (2) Title 18, United States Code, Section 2252A(a)(5)(B), possession of child pornography; (3) Title 18 United States Code Section 2252A(a)(2)(A), distribution receipt or distribution of child pornography, and Title 18, United States Code, Section 2252A(a)(2)(B), receipt or distribution of material containing child pornography.

YOU ARE HEREBY COMMANDED to search on or before ___11/19/07___
                                                                                    Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime -- 6:00 a.m. to 10:00 p.m.) (at any time in the day or night as I find reasonable cause has been established) and if the person or property be found there to seize the same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to __CATHY ANN BENCIVENGO , UNITED STATES MAGISTRATE JUDGE__ as required by law.

United States District Court Judge or United States Magistrate Judge

__11/9/07 @ 4:35 pm__ at          __San Diego, CA__
Date and Time Issued                          City and State

CATHY ANN BENCIVENGO
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer              Signature of Judicial Officer

## RETURN

| DATE WARRANT RECEIVED 11/09/2007 | DATE AND TIME WARRANT EXECUTED 11/13/2007  11:45 A.M. | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH Patricia Fusco (Deputy Attorney General), Detective Peter Felt (Regional Computer Forensics Laboratory) |
|---|---|---|

INVENTORY MADE IN THE PRESENCE OF
N/A Evidence already in custody of CAL-DOJ / Regional Computer Forensics Laboratory

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

N/A

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

*Jodi Jewett*

Subscribed, sworn to, and returned before me this date.

**CATHY ANN BENCIVENGO**
U.S. Judge or Magistrate

11/14/0
Date

ATTACHMENT A

ITEMS TO BE SEARCHED

The ITEMS TO BE SEARCHED are further described as follows:

a. Hewlett Packard M7000 desktop computer serial number MXK60804L3 and all hardware and software attached to, or otherwise accompanying this computer as seized;

b. Dell Dimension E521 desktop computer serial number HWC16C1 and all hardware and software attached to, or otherwise accompanying this computer as seized;

c. Hewlett Packard Touch Smart 1Q770 computer serial number CNH7010011 and all hardware and software attached to, or otherwise accompanying this computer as seized;

d. Sony Vaio laptop computer serial number VGNUX280P and all hardware and software attached to, or otherwise accompanying this computer as seized;

ATTACHMENT B

ITEMS TO BE SEIZED

1.    The following are the ITEMS TO BE SEIZED from the ITEMS TO BE SEARCHED, which constitute evidence, fruits and instrumentalities of violations of Title 18, United States Code, Section 2251, production of child pornography as it relates to interstate or foreign commerce, Title 18, United States Code, Section 2252A(a)(5)(B), possession of child pornography, Title 18 United States Code, Section 2252A(a)(2)(A), distribution receipt or distribution of child pornography, and Title 18 United States Code, Section 2252A(a)(2)(B), receipt or distribution of material containing child pornography:

        a.    Files or records that tend to identify the person(s) in control, possession, and ownership of the computers identified in ATTACHMENT A or of any other computers, including, but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, identification cards and documents, airline tickets and related travel documents, bank books, checks, and check registers, public storage facilities receipts, computer registration records and sales receipts;

        b.    Images of child pornography, or materials containing child pornography as defined in 18 U.S.C. Section 2256, which visually depict child pornography; contain information pertaining to the interest in child pornography; and/or distribute, receive, or possess child pornography, or information pertaining to an interest in child pornography;

1

1        c.   Files and records reflecting ownership, purchase,

2   possession, or use of computer devices or peripherals such

3   as web cameras and other video and audio recording devices,

4   that could be used to transmit live images over the Internet

5   or record images for later transmission over the Internet;

6        d.   Files and records relating to the provision of

7   internet service, including billing and toll records;

8        e.   Correspondence that are indicia of production,

9   possession, receipt, or distribution of child pornography

10  including, but not limited to, electronic mail, chat logs,

11  and electronic messages, establishing possession, access to,

12  receipt, production, distribution, or transmission through

13  interstate or foreign commerce, including by United States

14  mail or by computer, of visual depictions of minors engaged

15  in sexually explicit conduct, as defined in 18 U.S.C. §

16  2256;

17       f.   Correspondence relating or referring to

18  exploitation of children including, but not limited to

19  electronic mail, chat logs, and electronic messages,

20  establishing possession, access to, or transmission through

21  interstate or foreign commerce of child pornography as

22  defined in 18 U.S.C. § 2256, including by United States mail

23  or by computer.

24       g.   Files and records pertaining to possession,

25  production, receipt or distribution of child pornography, as

26  defined in 18 U.S.C. § 2256, including but not limited to:

27            (1)  Envelopes, letters, and other correspondence

28  including, but not limited to, electronic mail, chat

2

logs, and electronic messages, establishing possession,
access to, or transmission through interstate or
foreign commerce, including by United States mail or by
computer, of visual depictions of minors engaged in
sexually explicit conduct, as defined in 18 U.S.C. §
2256; and

(2)  Books, ledgers, and records bearing on the
production, reproduction, receipt, shipment, orders,
requests, trades, purchases, or transactions of any
kind involving the transmission through interstate or
foreign commerce including by United States mail or by
computer of any visual depiction of minors engaged in
sexually explicit conduct, as defined in 18 U.S.C. §
2256;

h.   Any files or records relating to the exploitation
of minors.

i.   Any files or records identifying individual e-mail
addresses and internet chat room names;

j.   Any files or records showing the acquisition
and/or sale of computer hardware, computer software,
computer documentation, and/or computer passwords and other
data security devices;

k.   Any files or records evidencing occupancy or
ownership of any residences and storage units registered to,
owned by, or controlled by JAMES ALBERT SWEENEY II,
including, but not limited to copies of utility and
telephone bills, mail envelopes, addressed correspondence
canceled mail, photographs, personal telephone books,

3

1    diaries, bills and statements, identification cards and

2    documents, airline tickets and related travel documents,

3    bank books, checks, and check registers, and public storage

4    facilities receipts.

5         1.    Any files, records, programs, application or

6    materials, including but not limited to, images and

7    electronically stored computer data that would lead to the

8    identity of any minors as depicted in electronic images or

9    evidenced in electronic communications.

10        m.    Mailing lists, mailing address labels and any and

11   all documents and records pertaining to any correspondence

12   between JAMES ALBERT SWEENEY II and any minor.

13        n.    Any files or records related to ownership, control

14   and use of digital cameras, camcorders, or other recording

15   devices.

16        o.    Electronic materials pertaining to the receipt of,

17   or orders or requests for visual depictions of a minor

18   involved in sexually explicit conduct, as defined in 18

19   U.S.C. § 2256;

20        p.    Names, lists of names or addresses and identifying

21   information of minors (such as names and dates of birth of

22   minors).

23        q.    As used above, the terms files, records, programs,

24   or correspondence includes files, records, programs, or

25   correspondence created, modified or stored in any form

26   including electronically.

27

28

1          ATTACHMENT C
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

0718070 1   06270702

2007 JUN 27  AM 9:27

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

## EXPERIENCE AND TRAINING OF AFFIANT

3      I, Aaron L. Ward, am an Investigator with the California Department of Justice (DOJ),

4   Special Crimes Unit, Office of the Attorney General. I have been employed as an Investigator with

5   the Department of Justice since April 2, 2001. Prior to my employment as an investigator with the

6   California Department of Justice, I was an United States Postal Inspector assigned to the Southern

7   California Division of the United States Postal Inspection Service. I retired from the position of

8   Postal Inspector on March 30, 2001, and took my current position. I was a Postal Inspector for

9   twenty years. For the last ten years of my Inspection Service career, my responsibilities included

10   investigating crimes involving mail fraud and supervising the activities of five other Postal

11   Inspectors. I have extensive experience investigating crimes involving financial transactions,

12   investment fraud schemes (including Ponzi schemes), and money laundering.

13      I completed an eleven week training course for Postal Inspectors at the United States Postal

14   Inspection Service (USPIS) Academy at Potomac, MD. I have attended both basic and complex

15   fraud training courses at the USPIS Academy in Potomac, MD. Additionally, I have received money

16   laundering and asset forfeiture training at the USPIS Academy in Potomac, MD. I have received

17   bankruptcy fraud training at the United States Attorney's Office (USAO), Central District of

18   California (CDC), Los Angeles, CA.

19      I have provided training on workers' compensation fraud investigations to other postal

20   inspectors. I have testified as an expert witness for the USAO, CDC, Los Angeles, CA., related to

21   telemarketing fraud investigations.

22      I have been a participant in the United States Attorney's Office, Southern California,

23   Investment Fraud Task Force, formed to pool resources and experiences in the investigation of

24   violations and abuses in the area of "boiler room" schemes. I have also been a member of the

25   County of Orange Boiler room Apprehension (COBRA) Task Force, which was comprised of

26   various federal and state agencies that investigated alleged telemarketing "boiler room" fraud.

27      During my career as a postal inspector, I have been the affiant on approximately 60 search

28   warrant affidavits, requesting to search and seize electronic files contained in computer equipment.

1

n6270702

1  bank accounts, brokerage accounts, and records from business and residential premises. In virtually

2  every instance in which a search warrant was issued, I found evidence of the crime alleged. I am

3  familiar with the United States Code and the California Penal Code relating to financial crimes,

4  conspiracy, and the rules of evidence.

5                            **INTRODUCTION**

6         This case was referred to the Department of Justice, Office of the Attorney General, in April

7  2007, after complaints by investors about the individuals and companies discussed below. The

8  Department of Justice enforcement attorney, Kirk Wallace, referred the case for the reason that it

9  was believed the below described individuals were operating an endless chain marketing scheme

10 and had defrauded investors of approximately $5 Million in unregistered stock, in addition to selling

11 memberships, in violation of the California Corporate Securities laws, as well as the California Penal

12 Code.

13                    **MISREPRESENTATIONS/OMISSIONS**

14        On June 20, 2007, I reviewed a Desist and Refrain order against James Albert Sweeney, II,

15 Richard Hickey, Patrick Ryan, and Rick Deluca doing business as Big Co op, Inc. and EZ.2 Win.Biz,

16 Inc. The Desist and Refrain (D and R) order was issued because James Albert Sweeney, II, Richard

17 Hickey, Patrick Ryan, and Rick Deluca doing business as Big Co op, Inc. and EZ2Win.Biz were

18 offering unregistered and unlicensed securities to the public. The D and R order pointed out that

19 James Albert Sweeney, II, Richard Hickey, Patrick Ryan, and Rick Deluca doing business as Big

20 Co op, Inc. and EZ.2 Win.Biz. Inc. failed to advise their investors of the following:

21      1.      That the public offering of Big Co op, Inc. stock still had not occurred several years

22              after prior purchasers had been told it would occur.

23      2.      That Big Co op, Inc. had made no significant effort to prepare the required

24              documents such as audited financial statements or business plans which would be

25              required to take the company public and had not applied to any State or Federal

26              regulatory agencies to be permitted to offer publicly traded stock.

27      3.      That the statements made to license purchasers in 2006 that Thomas Wiesel Partners

28              was going to take Big Co op, Inc. public in December of 2006 was also untrue in that

062 70 702

1   no request had been made at that time by Big Co op. Inc. to Thomas Wiesel Partners

2   to take any action or make any preparations to take Big Co op, Inc. public in

3   December of 2006, or at any other time.

4.  4.  That purchasers of licenses were not told that Big Co op. Inc. and EZ2Win.Biz had

5   operated at a loss in each year of its existence and had a continuing loss of over 4

6   million dollars by the end of 2006.

7.  5.  That almost all of the income for the company was generated by the sale of licenses

8   and fees charged to participants in the multilevel marketing scheme.

9.  6.  That income from Big Co op, Inc.'s "core business" of making commissions from the

10  sale of goods and services from third parties through the Big Co op internet shopping

11  network amounted to less than 1% of the company's income.

12  7.  That the certified public accountant who prepared the financial statements for Big

13  Co op, Inc. for the years 2003 2006 had included a notice with the statements for

14  each of those years that Big Co op, Inc. had not been able to market its products at

15  amounts sufficient to recover its service and administrative costs and had suffered

16  consecutive losses for 5 years. The accountant's notice concluded "because of

17  uncertainties surrounding the ability of the company to continue its operations and

18  to satisfy its creditors on a timely basis, there is doubt about the company's ability

19  to continue as a going concern."

20  ## INVESTIGATION AIROSA

21  On May 29, 2007, I interviewed Joy Paguiso Airosa who told me the following:

22  1.  In response to an investment tip from a neighbor she and her mother contacted

23  Patrick Ryan, President of EZ2Win.Biz. Ryan told them that Big Co op. Inc. was a

24  great investment opportunity that would be going public soon. The stock would be

25  worth $50.00 per share when the company goes public.

26  2.  Ryan told her that Big Co op, Inc. was an Internet shopping business that had

27  discount agreements with many big retail companies. like Sears, J.C. Penny.

28  Nordstrom's, and Target stores.

3

062 70 70.2

3.    Ryan and others compared Big Co op. Inc.. with Google.

4.    Based on this information her mother, on October 24, 2006, wrote a personal check (number 643) in the amount of $25,000.00 made payable to EZ2Win.Biz as an investment in Big Co op. Inc.

5.    Her mother and she didn't like the way Big Co op, Inc. handled their paperwork. For instance, it took the company until December 18, 2006, to get their stock certificate (for 28,000 shares) to them. They requested their money back soon after they invested.

6.    After many telephone calls and e mail messages, on December 20, 2006, they got their money back in the form of a check ($25,000) from another investor, not the company.

## ALGREEN

On May 29, 2007, I interviewed Mrs. Ann Algreen who told me the following:

1.    Her deceased husband made the investment in Big Co op, Inc. She attended some meetings with him and was involved in some conversations with Patrick Ryan who got him involved with the investment.

2.    Her husband met Ryan at the country club where they all golfed. Ryan latched onto her husband who treated him like a son.

3.    Ryan told them Big Co op was going public. As a result of Ryan's representations her husband invested $104,000.00 in Big Co op. Inc.

4.    At some point her husband and she started to have doubts about Big Co op. Inc. Ryan kept putting them off when they asked him about the company going public.

5.    Ryan kept giving her husband and her excuses for the company not going public. One excuse he gave was that the company was meeting with overseas investors. Ryan also talked about the company doing something in India.

6.    When her husband knew he was dying, he asked Ryan for their money back. Ryan told him he would have to check with his father, James Sweeney.

///

4

10/02/200   11:21   /14-567-2002   CA DEPT OF JUSTICE   PAGE 06

06270702

7.   Before he died, her husband had a meeting with James Sweeney at Sweeney's office In downtown Riverside. Their investment advisor accompanied her husband to this meeting. Sweeney refused to give her husband their money back.

## CICHY

On June 6, 2007, I interviewed Mr. Ron Cichy who told me the following:

1.   He met Patrick Ryan at a bar in downtown Riverside (just down the street from the business office). Ryan told him he had a great investment opportunity with his Internet shopping company.

2.   He befriended Ryan and they joined the Canyon Crest Country Club together.

3.   He made several investments with Big Co op, Inc. beginning in November 2001 when he invested $35,000.00 with the company. Ryan told him the stock was worth $1.00 per share, but would increase in value when the company goes public. He invested a total of $70,000.00 with the company.

4.   In addition to investments in the company, he gave Ryan numerous personal loans totaling in excess of $50,000. He also paid many of Ryan's bills.

5.   Ryan has since repaid most of the $50,000.00 of personal loans, with company checks [Ryan Enterprises (drawn on a Wells Fargo Bank account) and Big Co op, Inc. (drawn on an Inland Empire National Bank account)].

6.   Ryan told him the company was making money and was in the black. In fact, Ryan told him that the company was making $1 million per month.

7.   Ryan told him "the auditors" were ready to go into the company and do an audit so that the company would be closer to going public.

8.   Ryan also mentioned a reverse merger being in the works in order to take the company public.

9.   He found out that the company was engaged in the sale of illegal securities. Ryan told him 2 months ago (April 2007) that the company has spent $500,000.00 in legal fees to make the company legal.

///

06270702.

10.  Ryan gave him numerous reasons for the company not going public.  One reason was that a group of Norwegians were going to invest millions of dollars in Big Co op, Inc.

11.  The company would give away expensive gifts as inducements at sales meetings for the multi level marketing program ran by Big Co op, Inc.

## DAKOTA

On June 15, 2007, I interviewed Mr. John Dakota who told me the following:

1.  He invested $20,000.00 in Big Co op, Inc. after being told by Patrick Sweeney (a/k/a Patrick Ryan) that it was a great opportunity.

2.  Big Co op, Inc. would be going public within 90 days from his investment date or he would get his money back.

3.  After 90 days the company still had not gone public.

4.  He asked Ryan why the company hadn't gone public and he was told it would be another 90 days.

5.  When the second 90 days passed and the company hadn't gone public, he asked Ryan for his money back.

6.  Ryan told him he would have to submit a letter to the company in order for the legal channels to take place.

7.  When he didn't get a response to his first letter, he telephoned Ryan and told him he would go to the California Department of Corporations and to the News Media if he didn't get his money back.

8.  Ryan told him he would get his money back, but it would take approximately 4 months at $5,000.00 per month to do so.  He got his money back within 4 months.

9.  As he recalls the checks paying back his investment were drawn on an account at Wells Fargo Bank.

10.  When he invested with the company, Ryan was the President of EZ2Win.Biz, which is the marketing side of Big Co op, Inc.  James Sweeney was the CEO of Big Co op, Inc.

06270702

# WALLING

On June 20, 2007, I contacted Mr. Russell Walling, Owner/Building Manager, 3666 University Avenue, Suite 405, Riverside, California. He told me the following:

1. He has known James Sweeney doing business as Big Co op, Inc. for 8 or 9 years, when he moved into the building.

2. Sweeney and his adopted son, Patrick Ryan, seemed to alternate as president of the company.

3. He has tried to help Sweeney with his business over the years and consequently Sweeney owes him $229,000.00 in back rent over a 3 or 4 year period.

4. On or about June 6, 2007, Sweeney moved out of the building without paying his back rent.

5. Mr. Walling took possession of 9 Dell desktop computers belonging to Sweeney and his business; Sweeney and his business associates had abandoned the computers. After taking the nine (9) Dell desktop computers from the Big Co-op offices, Mr. Walling had the entrance doors to the 3rd floor re-keyed.

6. Sweeney took the computer that was in his office, Ryan took the computer that was in his office; and Ryan's ex wife, Kelli Ryan, who was also the company's chief financial officer/bookkeeper, took the computer that was in her office.

7. He has the 9 Dell computers on tables in a storage room in the basement of the building.

8. He knows that Sweeney and Ryan did their business banking at Wells Fargo Bank, which is down the street on University; and the Inland Empire National Bank, which is on the mall on Main Street.

## OBSERVATIONS ON THE THIRD (3RD) FLOOR

On June 20, 2007, Mr. Walling gave me a tour of the third (3rd) floor of his building. This is the floor space that was occupied by Sweeney and his associates doing business as Big Co-op, Inc. and EZ2Win.Biz. While touring the third (3rd) floor of the building, I observed the following:

///

7

06270702

1.   Walling unlocked the front entrance door to the suite of offices on the third (3rd) floor with a key that was on a large ring with other keys.

2.   I observed a large open area that ran from one end of the third floor to the other end. This open area had individual offices off of it. I estimated that there are 8 to 10 individual offices within the office suite. Some offices are larger than others. Mr. Walling told me that Sweeney and Ryan had the larger offices.

3.   Inside most of the individual offices, I saw trash receptacles filled with what appeared to be computer instruction manuals, Big Co-op/EZ2Win.Biz business instruction manuals and other documents.

4.   I observed the offices to be virtually empty except for the trash receptacles and some office furniture.

## BANK LOCATIONS TO BE SEARCHED

With regard to the Wells Fargo Bank accounts at 3750 University Avenue, Riverside, California and the accounts at Inland Empire National Bank at 3737 Main Street, Suite 104, Riverside, California, based on the below information and my experience, I believe there is probable cause to believe that there are Ryan Enterprises, Big Co op, Inc. and EZ2Win.Biz, Inc., as well as Sweeney and Ryan financial records, which are on the premises and are evidence of the crimes described below.

## BASEMENT STOREROOM LOCATION

With respect to the nine (9) Dell desktop computers currently being stored in the basement storeroom at the Walling Building, 3666 University Avenue, Riverside, California, based on the below information and my experience I believe there is probable cause to believe that there are business and financial records related to Ryan Enterprises, Big Co op, Inc. and EZ2Win.Biz, Inc., which are on the premises and are evidence of the crimes described below.

## THIRD FLOOR WALLING BUILDING LOCATION

With respect to the third floor of the Walling Building, 3666 University Avenue, Riverside, CA 92501, based on the above information and my experience, I believe there is probable cause to believe that there are computer instruction manuals and Big Co-op, Inc./EZ2Win.Biz business

06270702

1  manuals and other documents in trash receptacles in the individual offices within the suite of offices
2  on the third (3rd) floor, which are on the premises and are evidence of the crimes described below.

### PERSONAL RESIDENCES

4          With respect to the personal residences of Patrick Michael Ryan, 1048 Peter Christian Circle,
5  Corona, California 92881; and the residence of Kelli Ann Ryan, the company's chief financial
6  officer/bookkeeper, 29449 Tours Street, Lake Elsinore, California , based on the information
7  described herein and my experience I believe there is probable cause to believe that there are Ryan
8  Enterprises, Big Co op, Inc. and EZ2Win.Biz, Inc., business records and financial information,
9  which are on the premises and is evidence of the crimes described below.
10 Based on the information contained herein, my experience and the experience of other agents and
11 investigators with whom I have worked, I believe there is probable cause to believe that the bank
12 records and the electronic records requested in this affidavit and stored in the nine (9) Dell desktop
13 computers kept in the basement storage room of the Walling Building and the two (2) computers
14 kept in the separate, personal residences of Patrick Ryan and his ex-wife, Kelli Ann Ryan, as well
15 as the instruction and business manuals contained in trash receptacles on the third (3rd) floor of the
16 Walling Building contain evidence of the on going securities fraud and theft perpetrated on the
17 public by James Albert Sweeney II and Patrick Michael Ryan doing business as Ryan Enterprises,
18 Big Co op, Inc. and EZ2Win.Biz, Inc., as described below:

### APPLICABLE CRIMINAL STATUTES

20         Section 25401 of the California Corporate Securities law states that it is unlawful for any
21 person to offer or sell a security in this state or buy or offer to buy a security in this state by means
22 of any written or oral communication which also includes an untrue statement of material fact or
23 omits to state a material fact necessary in order to make the statements made in light of the
24 circumstances under which they were made, not misleading.

25         Section 25110 of the California Corporation Securities Law states that it is unlawful for any
26 person to offer or sell in this state any security in an issuer transaction unless such sale has
27 been qualified under section 25111, 25112 or 25113 or unless such security or transaction is
28 exempted or not subject to qualification.

9

062 70 7 02

1    Section 25540(a) of the California Corporate Securities Law states any person who willfully

2    violates any provision of the Corporate securities Law of 1968, or who willfully violates any rule

3    or order under said division, shall upon conviction be fined not more than one million dollars

4    ($1,000,000) , or imprisoned in the state prison, or in county jail for not more than one year, or be

5    punished by both fine and imprisonment.

6    Section 25540(b) of the California Corporate Securities law sates any person who willfully

7    violates section 25400, 25401 or 25402, or who willfully violates any rule or order under the

8    Corporate Securities Law of 1968, adopted pursuant to those provisions, shall upon conviction be

9    fined not more than ten million dollars ($10,000,000), or imprisoned in the state prison for two (2),

10    three (3), or five (5) years, or be punished by both fine and imprisonment.

11    Section 327 of the California Penal Code states that it is unlawful for any person to contrive,

12    prepare, set up, propose, or operate any endless chain an "endless chain" means any scheme for the

13    disposal or distribution of property whereby a participant pays a valuable consideration for the

14    chance to receive compensation for introducing one or more additional persons into the participation

15    in the scheme or for the chance to receive compensation when a person introduced by the participant

16    introduces a new participant. This crime is punishable by imprisonment in the county jail not

17    exceeding one year or in the state prison for 16 months, two or three years.

18    Section 487 of the California Penal code states that Grand Theft is committed in any of the

19    following cases: (a) when the money, labor or real or personal property taken is of a value exceeding

20    four hundred dollars ($400).

21    **WELLS FARGO AND INLAND EMPIRE NATIONAL BANKS**

22    On June 20, 2007, I went to the Wells Fargo Bank, which is down the street from the

23    Walling Building (3666 University Avenue) and observed that the address is 3750 University

24    Avenue (the Riverside Main Office), Riverside, California 92501.

25    On June 20, 2007, I went to the Inland Empire National Bank, which is on the mall on

26    Main Street as described by Mr. Walling and learned the following:

27    1.    The address is 3737 Main Street, Suite 104, Riverside, California 92501.

28    ///

10

n62 70 702

2.   Alice Henderson is the Operations Manager at this bank.  She told me that:

   a.   She knows the business name Big Co op, Inc.

   b.   Account number: 001515756 is maintained at her branch.

   c.   Legal documents should be served on the main office at 3727 Arlington Avenue, Riverside, CA 92706.

During the Investigation I reviewed the checks given me by investors Airosa/Paguio and Cichy and learned the following:

1.   The check Paguio used to pay Big Co op, Inc (EZ2Win.Biz) showed the following:

   a.   The check number is 643 and is dated 10/24/2006; it is made payable to EZ2Win.Biz in the amount of $25,000.00.

   b.   The back of the check shows that it was deposited to an account titled EZ2Win.BIZ; the number is 6655853429 (I have seen this same series of numbers on a Wells Fargo Bank check written to Mr. Cichy).

2.   One of the checks given me by Mr. Cichy was drawn on a Well Fargo Bank account (number: 6655851878).  It is check number 1077 and is dated 1/10/2006.  The check is in the amount of $1,000.00.  The memo section of the check reads: "loan pay back to him." The account name is Ryan Enterprises, 3666 University Ave. FL 3, Riverside, CA 92501 3346.

3.   Another check given me by Mr. Cichy shows the following:

   a.   The check number is 3209 drawn on Inland Empire National Bank, Riveside, CA 92501. The check is dated 6/8/2004.

   b.   The account name is Big Co op, Inc., 3666 University Ave. 3RD Floor, Riverside. CA 92501.

   c.   The account number is 001515756.

**PERSONAL RESIDENCE  PATRICK RYAN (A/K/A PATRICK SWEENEY)**

When interviewed June 20, 2007, Mr. Russell Walling reported that Patrick Ryan had taken his desktop computer from his office on June 6 8, 2007. During the investigation I learned that

11

062707 02

1   Patrick Ryan lives at 1048 Peter Christian Circle, Corona. California 92881.  On June 25, 2007, I
2   went to the address 1048 Peter Christian Circle, Corona. California 92881 and observed the
3   following:

4       1.    A dark blue Mercedes Benz bearing California license plate number "5YGT009"
5             was parked in the driveway.  Another dark colored Mercedes Benz bearing no
6             license plates was parked on the street in front of the house.
7       2.    A subsequent check with the California Department of Motor Vehicles revealed
8             that plate number "5YGT009" is registered to Patrick Ryan and/or Kelli Ryan,
9             1048 Peter Christian Circle, Corona, California.

10                      **PERSONAL RESIDENCE  KELLI RYAN**

11      When he was interviewed on June 20, 2007, Mr. Walling told me that Kelli Ryan was the
12  chief financial officer/bookkeeper for the Big Co op, Inc. and EZ2Win.Biz business.  He said he
13  knows that she took the desktop computer that she used at the business.  During the investigation,
14  I learned that Kelli Ryan lives at 29449 Tours Street, Lake Elsinore, California. On June 25, 2007,
15  I went to the address 29449 Tours Street, Lake Elsinore, California, and observed the following:

16      1.    A new looking dark blue Mercedes Benz bearing personalized California license
17            plates "SXYCFO" was parked in the driveway.  There were two (2) other vehicles
18            parked in the driveway also.  One was a dark colored Cadillac Escalade with no
19            plates; the other was a dark colored SUV bearing personalized California license
20            plates "WUCARDZ."
21      2.    A subsequent check with the California Department of Motor Vehicles revealed
22            that plate number "5YGT009" is registered to Kelli Ann Ryan, 29449 Tours
23            Street, Lake Elsinore, California.

24                      **SEIZURE OF DIGITAL EVIDENCE**

25      With respect to the nine (9) Dell computers currently being stored in the basement storeroom
26  of the Walling Building at 3666 University Avenue. Riverside, California 92501; and the three (3)
27  desk top computers taken from the business location by James Albert Sweeney, Patrick Michael
28  Ryan, and Patrick Ryan's ex wife, Kelli Ann Ryan and believed to be kept at their personal

12

062 70 702

1  residences, I have consulted with Robert Werbick, whom I have known and worked with for over

2  15 years.  Robert Werbick has been employed as a Postal Inspector with the United States Postal

3  Inspection Service, Los Angeles Division since November 1991.  Beginning in December 2001,

4  Postal Inspector Werbick has been assigned to the Forensic Laboratory Services Division, Dulles,

5  Virginia as Program Manager, Digital Evidence Unit domiciled in Anaheim, CA, where his duties

6  have included the investigation of criminal offenses  including high technology crime, account

7  fraud, check fraud, and identity theft  and the forensic examination of computers.  Postal Inspector

8  Werbick possesses a Bachelor of Science degree in electrical engineering from California

9  Polytechnic University, Pomona, California.  He has attended numerous specialized training courses

10  in forensic science, including training in Encase forensic science.

11        Based on my training, experience and my conversations with Postal Inspector Werbick, I am

12  aware of the following: (1) that individuals engaged in securities fraud and grand theft often use

13  computers as tools of their crime, to store clients' personal and account information, to create

14  company records, correspondence to clients/customers, and company update information and to

15  store company and personal financial transaction records; (2) that suspects use computers to obtain

16  goods, services, and/or other personal and company assets; (3) that computer users will commonly

17  keep computers and computer systems in their homes and places of employment; (4) that computer

18  users frequently back up copies of software to guard against loss if their computer malfunctions;

19  they keep those backup copies at their residence and/or place of employment; and (5) that software

20  and digital data is portable and is often transported to and from residences in automobiles and is

21  occasionally hidden in automobiles.

22        In addition, Postal Inspector Werbick advised me why all computers and computer

23  equipment must be removed from search warrant sites and searched under controlled circumstances.

24  Because of the ways in which computer technologies store or process data, files relating to criminal

25  investigations are often stored with unrelated records.  In order to determine which records may be

26  seized pursuant to a search warrant, it is necessary to use appropriate forensic software to open and

27  ///

28  ///

1    view the contents of all files. Postal Inspector Werbick further advised me that the file name in the

2    folder/directory is not a reliable indicator of the true nature of its contents, especially where there

3    may be a desire on the user's part to conceal certain records.

4    Postal Inspector Werbick has also been trained in methods to recover hidden, deleted, and

5    erased files. Based on his experience and training, he advises me that digital files reside, in whole

6    or in part, on a computer's hard drive or other external electronic storage media until they are

7    overwritten. Under many operating systems software (including Microsoft Windows 95 or higher),

8    it is frequently possible to reconstruct deleted or erased files, as well as the fact of the deletion and

9    the time and date of the deletion. Such facts can be evidence of an attempt to destroy, hide or

10   fabricate evidence, and may be evidence of consciousness of guilt. According to Postal Inspector

11   Werbick, computer users may also conceal data through a number of methods, including the use of

12   misleading filenames and extensions. For example, files with the extension ".jpg" are digital image

13   files. However, a computer user could change a ".jpg" file extension to ".txt" or ".dll;" in order to

14   create an appearance that a digital image is actually a text or system file. It is often difficult for an

15   investigator to notice such anomalies without conducting a properly controlled forensic examination

16   at a location away from the search site.

17   Postal Inspector Werbick advised me that conducting a search of a computer system's files,

18   documenting the search, and making evidentiary and discovery copies is a lengthy and time

19   consuming process, particularly with the increased data storage capacity of newer computers. He

20   said it is also necessary to determine that no security devices are in place, both hardware and

21   software, which could cause the destruction of evidence during the search. He said in some cases

22   it is impossible even to conduct the search without expert technical assistance, especially if the

23   data is stored on a network server and/or Unix operating system. He said expert technical assistance

24   may also be required if the computer system and files have been protected using an encryption

25   method. Since computer evidence is extremely vulnerable to tampering or destruction through error,

26   electrical outages. and other causes, the removal of the system from the premises will greatly assist

27   in retrieving the records authorized to be seized, while avoiding destruction or deliberate alteration

28   of the records. He said it would be very difficult to search the computer system's files on the

n62 70 702

1   premises during the execution of a search warrant. Instead, a search could take several weeks or

2   months, depending on the technical difficulties encountered. He told me that in almost every

3   instance the suspect's computer(s) and removable electronically stored media should be removed

4   from the crime scene and their contents be examined in a controlled environment to preserve the

5   evidentiary integrity of the data.

6          Postal Inspector Werbick advised me that any use of a subject's computer to examine files

7   should be avoided, since it could be rigged to destroy or alter data. He also told me that it is

8   impossible to ensure that any equipment brought by law enforcement personnel to a search site could

9   be used to adequately examine storage media present at the location, since the type and quantity of

10  storage media is usually not known prior to conducting a search. In addition, it is impossible to

11  predict which application programs, drivers, and other software (out of hundreds available on the

12  market) have been used by the subject to create files stored on the computer media.

13         For this reason, Postal Inspector Werbick advised me that all software associated with any

14  seized computer must also be seized since it would be impossible, without examination, to determine

15  if it is standard commercially available software. He said in many instances it is necessary to

16  examine the software applications used to create files in order to read the files. Additionally,

17  without examination, it is impossible to determine if a disk, purporting to contain a standard

18  commercially available software program, is also being used to store data or information relevant

19  to the ongoing investigation.

20         I was also advised by Postal Inspector Werbick that system documentation, instruction

21  manuals, and software manuals relating to the computer system also need to be seized in order to

22  properly operate that specific system, and to accurately obtain and copy the records and files

23  authorized to be seized. This documentation may also further assist in establishing the ownership

24  and/or the operator of the computer system being seized. He also told me that computer users

25  frequently employ passwords to protect their data files and records. He said that in many instances

26  the computer user will often write passwords in their system manuals, notebooks, on post it notes,

27  etc., and it is therefore necessary to seize all written material that is in close proximity of a computer

28  system being seized.

/5

n62 70702

1   premises during the execution of a search warrant.  Instead, a search could take several weeks or

2   months, depending on the technical difficulties encountered.  He told me that in almost every

3   instance the suspect's computer(s) and removable electronically stored media should be removed

4   from the crime scene and their contents be examined in a controlled environment to preserve the

5   evidentiary integrity of the data.

6          Postal Inspector Werbick advised me that any use of a subject's computer to examine files

7   should be avoided, since it could be rigged to destroy or alter data.  He also told me that it is

8   impossible to ensure that any equipment brought by law enforcement personnel to a search site could

9   be used to adequately examine storage media present at the location, since the type and quantity of

10  storage media is usually not known prior to conducting a search.  In addition, it is impossible to

11  predict which application programs, drivers, and other software (out of hundreds available on the

12  market) have been used by the subject to create files stored on the computer media.

13         For this reason, Postal Inspector Werbick advised me that all software associated with any

14  seized computer must also be seized since it would be impossible, without examination, to determine

15  if it is standard commercially available software.  He said in many instances it is necessary to

16  examine the software applications used to create files in order to read the files.  Additionally,

17  without examination, it is impossible to determine if a disk, purporting to contain a standard

18  commercially available software program, is also being used to store data or information relevant

19  to the ongoing investigation.

20         I was also advised by Postal Inspector Werbick that system documentation, instruction

21  manuals, and software manuals relating to the computer system also need to be seized in order to

22  properly operate that specific system, and to accurately obtain and copy the records and files

23  authorized to be seized.  This documentation may also further assist in establishing the ownership

24  and/or the operator of the computer system being seized.  He also told me that computer users

25  frequently employ passwords to protect their data files and records.  He said that in many instances

26  the computer user will often write passwords in their system manuals, notebooks, on post it notes,

27  etc., and it is therefore necessary to seize all written material that is in close proximity of a computer

28  system being seized.

*16*

062 70 70 2

1    Therefore, I request that investigating officers be authorized, at their discretion, to seize all

2    "computer systems," "computer program or software," and "supporting documentation" as defined

3    by Penal Code section 502, subdivision (b), including any peripherals, and any supporting hardware,

4    software, and to conduct an off site search of the seized items for the evidence described in this

5    affidavit. I further request that investigating officers, and those agents acting under the direction of

6    the investigating officers, be authorized to access all computer data to determine if the data contains

7    "property," "records," and "information," and that, if necessary, investigating officers be authorized

8    to employ the use of outside experts, acting under the direction of the investigating officers, to

9    access and preserve computer data. I request authorization for investigating officers to seized any

10   digital evidence found during the execution of this search warrant, to transported such evidence from

11   the search location, and to conduct a search and analysis at a location designated by investigating

12   officers. With respect to any above described computer found during a search executed within ten

13   days of the issuance of this warrant, I request authorization for officers or their agents to seize,

14   transport, and analyze such computers, and that such a search may continue beyond ten (10) days

15   after the issuance of the search warrant.

16       I also request permission to videotape and/or photograph the execution of this search

17   warrant. I expect to examine computer(s) at the scene of the search. Those computers may be

18   operating when I arrive at the premises. The images on the screens of the computers are transient,

19   meaning that they disappear when the computer is turned off. I need to be able to videotape and/or

20   photograph any such images because they may be evidence (e.g., incriminating documents being

21   written by the user when the search warrant is executed). The videotape or photographs may be

22   useful in documenting what was done to the computers. Photography of the location and persons

23   present at the scene is also often helpful in showing possession of the premises and evidence of

24   association of the parties.

25                              CONCLUSION

26       Based on the information contained herein, my experience and the experience of other agents

27   and investigators with whom I have worked, I believe there is probable cause to support the issuance

28   of search warrants as set forth in Penal Code Section 1524 to search for any accounts listed in

     Attachment "A" and to provide all information from those accounts to me. I believe there is

17

062 70 70 2

1  probable cause to support the issuance of a search warrant as set forth in Penal Code Section 1524

2  to search for and seize the nine (9) Dell computers currently being stored by Mr. Russell Walling

3  in the basement of his office building as well as the desk top computers taken from the business

4  location and believed to be kept at the personal residences of Patrick Michael Ryan and Patrick

5  Ryan's ex wife, Kelli Ann Ryan.  Additionally, I believe there is probable cause to support the

6  issuance of a search warrant as set forth in Penal Code Section 1524 to search for and seize financial

7  and business records as well as computer and business manuals currently kept in trash receptacles

8  in offices on the third (3rd) floor of the Walling Building.  These documents and records will assist

9  in determining if James Albert Sweeney II and Patrick Michael Ryan doing business as Ryan

10  Enterprises, Big Co op, Inc. and EZ2Win.Biz, Inc., have committed grand theft and fraud.

11  Deputy Attorney General Patricia Fusco has reviewed this document.

12  Given under my hand and dated this _27_ day of June 2007.

13

14

Aaron L. Ward

15                                                          7/18/2007

16  Subscribed and sworn to before
    me this _27_ day of June 2007,
17  at 9:30 A.M / P.M.

18                                                          JUDGE OF THE SUPERIOR COURT

19                                                          CLERK
                                                            FOR THE JUDICIAL DISTRICT
20
                                                            BY _____
21                                                              DEPUTY CLERK

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT  D

RECEIVED
SUPERIOR COURT OF CALIF.
COUNTY OF RIVERSIDE

2007 JUL 18  AM 9: 41

BY _____

0718070

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

**EXPERIENCE AND TRAINING OF AFFIANT**

1

2

3    I, Aaron L. Ward, am an Investigator with the California Department of Justice (DOJ),

4  Special Crimes Unit, Office of the Attorney General. I have been employed as an Investigator with

5  the Department of Justice since April 2, 2001. Prior to my employment as an investigator with the

6  California Department of Justice, I was a United States Postal Inspector assigned to the Southern

7  California Division of the United States Postal Inspection Service. I retired from the position of

8  Postal Inspector on March 30, 2001, and took my current position. I was a Postal Inspector for

9  twenty years. For the last ten years of my Inspection Service career, my responsibilities included

10  investigating crimes involving mail fraud and supervising the activities of five other Postal

11  Inspectors. I have extensive experience investigating crimes involving financial transactions,

12  investment fraud schemes (including Ponzi schemes), and money laundering.

13    I completed an eleven-week training course for Postal Inspectors at the United States Postal

14  Inspection Service (USPIS) Academy at Potomac, MD. I have attended both basic and complex

15  fraud training courses at the USPIS Academy in Potomac, MD. Additionally, I have received money

16  laundering and asset forfeiture training at the USPIS Academy in Potomac, MD. I have received

17  bankruptcy fraud training at the United States Attorney's Office (USAO), Central District of

18  California (CDC), Los Angeles, CA.

19    I have provided training on workers' compensation fraud investigations to other postal

20  inspectors. I have testified as an expert witness for the USAO, CDC, Los Angeles, CA., related to

21  telemarketing fraud investigations.

22    I have been a participant in the United States Attorney's Office, Southern California,

23  Investment Fraud Task Force, formed to pool resources and experiences in the investigation of

24  violations and abuses in the area of "boiler-room" schemes. I have also been a member of the

25  County of Orange Boiler-room Apprehension (COBRA) Task Force, which was comprised of

26  various federal and state agencies that investigated alleged telemarketing "boiler-room" fraud.

27  ///

28  ///

1

071 80 70

RECEIVED
SUPERIOR COURT OF CALIF.
COUNTY OF RIVERSIDE

2007 JUL 18  AM 9: 41

BY

Supp [strikethrough]

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

**EXPERIENCE AND TRAINING OF AFFIANT**

I, Aaron L. Ward, am an Investigator with the California Department of Justice (DOJ), Special Crimes Unit, Office of the Attorney General. I have been employed as an Investigator with the Department of Justice since April 2, 2001. Prior to my employment as an investigator with the California Department of Justice, I was a United States Postal Inspector assigned to the Southern California Division of the United States Postal Inspection Service. I retired from the position of Postal Inspector on March 30, 2001, and took my current position. I was a Postal Inspector for twenty years. For the last ten years of my Inspection Service career, my responsibilities included investigating crimes involving mail fraud and supervising the activities of five other Postal Inspectors. I have extensive experience investigating crimes involving financial transactions, investment fraud schemes (including Ponzi schemes), and money laundering.

I completed an eleven-week training course for Postal Inspectors at the United States Postal Inspection Service (USPIS) Academy at Potomac, MD. I have attended both basic and complex fraud training courses at the USPIS Academy in Potomac, MD. Additionally, I have received money laundering and asset forfeiture training at the USPIS Academy in Potomac, MD. I have received bankruptcy fraud training at the United States Attorney's Office (USAO), Central District of California (CDC), Los Angeles, CA.

I have provided training on workers' compensation fraud investigations to other postal inspectors. I have testified as an expert witness for the USAO, CDC, Los Angeles, CA., related to telemarketing fraud investigations.

I have been a participant in the United States Attorney's Office, Southern California, Investment Fraud Task Force, formed to pool resources and experiences in the investigation of violations and abuses in the area of "boiler-room" schemes. I have also been a member of the County of Orange Boiler-room Apprehension (COBRA) Task Force, which was comprised of various federal and state agencies that investigated alleged telemarketing "boiler-room" fraud.

///

///

1

0718 0 70 1

1  During my career as a postal inspector, I have been the affiant on approximately 60 search warrant

2  affidavits, requesting to search and seize electronic files contained in computer equipment, bank

3  accounts, brokerage accounts, and records from business and residential premises. In virtually every

4  instance in which a search warrant was issued, I found evidence of the crime alleged. I am familiar

5  with the United States Code and the California Penal Code relating to financial crimes, conspiracy,

6  and the rules of evidence.

7                                    **INTRODUCTION**

8          This case was referred to the Department of Justice, Office of the Attorney General, in April

9  2007, after complaints by investors about the individuals and companies discussed below. The

10 Department of Corporations (DOC) enforcement attorney, Kirk Wallace, referred the case for the

11 reason that it was believed the below-described individuals were operating an endless-chain

12 marketing scheme and had defrauded investors of approximately $5 Million in unregistered stock. In

13 addition to selling memberships, in violation of the California Corporate Securities laws, as well as

14 the California Penal Code. The DOC has issued two Desist and Refrain Orders against James Albert

15 Sweeney, Big Co-Op, Inc. and EZ2Win.Biz and others. After the most recent Desist and Refrain

16 Order was served, Attorney Wallace informed us that Mr. Sweeney had started a new company to

17 continue Big Co-Op's Business. The name of that business is Together4Good, a Nevada

18 Corporation.

19         This supplemental affidavit is being submitted in support of applications for search warrants

20 on the residence of James Albert Sweeney, CEO, Big Co-op, Inc. and EZ2Win.Biz, 4555 Mission

21 Inn Avenue, Riverside, California and two (2) storage units maintained by Sweeney at A-American

22 Self-Storage at 2431 Rubidoux Avenue, Riverside, California

23         On Wednesday, June 27, 2007, Superior Court Judge J. A. Edwards authorized six search

24 warrants (No: 06270702) relating to this matter. The Affidavit submitted in support of those six (6)

25 search warrants is incorporated herein by reference and is attached to this supplemental affidavit as

26 exhibit 1. One of the six search warrants was for the residence of Kelli Ann Ryan, CFO, Big Co-op,

27 Inc. and EZ2Win.biz. I was a member of the task force that searched Ms. Ryan's residence. During

28 the search of Ms. Ryan's residence, she told me the following:

                                                                                    2

071 80 70 1.

a. She resigned her position at Big Co-op, Inc and EZ2Win.Biz in May 2007.

b. In early June 2007, James Sweeney moved his business out of the offices at 3666 University Avenue, 3rd Floor, Riverside, CA.

c. Sweeney took desktop computer that she used to use in her work for Big Co-op, Inc/EZ2Win.Biz, wiped the computer's hard drive, and then gave the computer to her.

d. The computer Sweeney gave to her still has the company's (Big Co-Op, Inc/EZ2Win.Biz) financial files on it in the form of QuickBooks files.

e. She has spoken to Richard Hickey who used to work with her at Big Co-Op, Inc/EZ2Win.Biz and he told her he packed up a number of boxes with business records and took them to Sweeney's personal residence and placed many of the boxes in Sweeney's garage. When the garage got too full he took some boxes to the storage units.

f. Sweeney lives at 4555 Mission Inn Avenue, Riverside, California.

g. Sweeney had 3 storage units at A-American Self-Storage. Riverside, California. She believes he now has two (2) units there.

On Monday. July 2, 2007, I went to the address 4555 Mission Inn Avenue, Riverside, California, and observed the following:

h. The residence is a 2-story single-family residence on the north side of Mission Inn Avenue. Redwood Drive is to the east. It is dark tan in color and trimmed in a maroon and blue. The residence has an orange colored, ceramic tile roof.

i. There is a balcony on the second floor of the residence.

j. Entrance to the residence is through a single glass door framed in wood (colored maroon). The entrance door is in the center of the residence.

k. There are 2 sets of stairs leading from the street to the entrance doors. There are 2 statutes of lions (white in color) on either side of the steps closest to the entrance door.

///

3

1       On Monday, July 2, 2007, I spoke with Postal Inspector Dave Zemke who told me that he

2 had checked on the address, 4555 Mission Inn Avenue, with the Riverside Post Office and learned

3 that James A. Sweeney receives mail at the address.

4       On Thursday, July 12, 2007, I went to the A-American Self-Storage at 2431 Rubidoux

5 Avenue, Riverside, California and learned the following:

6

7       a.   The above location is a commercial structure located in the city and

8           the county of Riverside. It is has a gray exterior, trimmed in dark blue.

9       b.   The property is clearly marked by signage at the intersection of

10           Rubidoux and 24th Streets that reads: A-American Self Storage. The

11           signage is on a white back ground with blue letters and three wavy

12           horizontal lines (denoting the American Flag) after the first "A." The

13           signage can be seen from Rubidoux Avenue and there is a sign on 24th

14

15           Street.

16       c.   Entrance to the self-storage unit is off of 24th Street. Unit numbers

17           142 and 162 are on the east side of the main driveway leading from

18           24th Street.

19

20       d.   Unit number 142 is 10' by 18'. It is clearly marked by the numbers

21           142 that are white in color and are affixed to the wall on the storage

22           unit about ½ up the overhead door. There are red fire extinguishers

23           mounted on the exterior of the storage units walls. The fire

24           extinguishers are at every five storage units. Unit 142 is two (2) fire

25           extinguishers from the entrance gate. The overhead door is dark blue

26           in color.

27

28       e.   Self-Storage unit 162 is 10' by 15'. It is located on the same side of

NOV-06-2007   BURN DOUANE                          PAGE 15

0718 070 1

the driveway as unit 142. It is clearly marked by the numbers 162 that are white in color and are affixed to the wall on the storage unit about ⅓ up the overhead door. The overhead door is dark blue in color.

Unit 162 is near the fifth fire extinguisher.

f.   James Sweeney doing business as Big Co-op, Inc. rents units 142 and

162.

g.   Sweeney was in earlier that day to argue about being assessed a late

fee

of $20.00 for being late paying for the rental of the storage units.

## APPLICABLE CRIMINAL STATUTES

Section 25401 of the California Corporate Securities law states that it is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which also includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements made in light of the circumstances under which they were made, not misleading.

Section 25110 of the California Corporation Securities Law states that it is unlawful for any person to offer or sell in this state any security in an issuer transaction...unless such sale has been qualified under section 25111, 25112 or 25113...or unless such security or transaction is exempted or not subject to qualification...

Section 25540(a) of the California Corporate Securities Law states any person who willfully violates any provision of the Corporate securities Law of 1968, or who willfully violates any rule or order under said division, shall upon conviction be fined not more than one million dollars ($1,000,000), or imprisoned in the state prison, or in county jail for not more than one year, or be punished by both fine and imprisonment.

Section 25540(b) of the California Corporate Securities law sates any person who willfully violates section 25400, 25401 or 25402, or who willfully violates any rule or order under the Corporate Securities Law of 1968, adopted pursuant to those provisions, shall upon conviction be

5

6718070 1

1  fined not more than ten million dollars ($10,000,000), or imprisoned in the state prison for two (2),

2  three (3), or five (5) years, or be punished by both fine and imprisonment. Section 327 of the

3  California Penal Code states that it is unlawful for any person to contrive, prepare, set up, propose,

4  or operate any endless chain...an "endless chain" means any scheme for the disposal or distribution

5  of property whereby a participant pays a valuable consideration for the chance to receive

6  compensation for introducing one or more additional persons into the participation in the scheme or

7  for the chance to receive compensation when a person introduced by the participant

8  introduces a new participant. This crime is punishable by imprisonment in the county jail not

9  exceeding one year or in the state prison for 16 months, two or three years.

10      Section 487 of the California Penal code states that Grand Theft is committed in any of the

11  following cases: (a) when the money, labor or real or personal property taken is of a value exceeding

12  four hundred dollars ($400)...

## CONCLUSION

14      With respect to the personal residence of James A. Sweeney I believe there is probable cause

15  to support the issuance of a search warrant to search the premises described in Attachment A,

16  location 1, as set forth in Penal Code Section 1524 to search for and seize financial and business

17  records in any form as described in Attachment B.  Records in the form of electronic files stored on

18  computers will be treated as indicated in exhibit 1, pages 12 through 17. These documents and

19  records will assist in determining if James Albert Sweeney II and Patrick Michael Ryan doing

20  business as Ryan Enterprises, Big Co-op, Inc. and EZ2Win.Biz, Inc., have committed grand theft

21  and fraud.

22      With respect to the 2 storage units maintained by James A. Sweeney at A-American Self-

23  Storage, 2431 Rubidoux Avenue, Riverside, California. I believe there is probable cause to support

24  the issuance of search warrants as set forth in Penal Code Section 1524 to search the self-storage

25  units described in Attachment A, location 2 for and seize financial and business records in any form

26  described in Attachment B.  Records in the form of electronic files stored on computers will be

27  treated as indicated in exhibit 1, pages 12 through 17.  These documents and records will assist in

28  ///

1   ///
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

7

0718070 1

1 | determining if James Albert Sweeney II and Patrick Michael Ryan doing business as Ryan

2 | Enterprises, Big Co-op, Inc. and EZ2Win.Biz, Inc., have committed grand theft and fraud.

3 |       Deputy Attorney General Patricia Fusco has reviewed this document.

4 |       Given under my hand and dated this _____ day of July 2007.

5 |

6 |

7 |                                            Aaron L. Ward

8 |

9 | Subscribed and sworn to before

10 | me this _15th_ day of July 2007,

11 | at _____ A.M./ P.M.

12 |

13 |

14 |           JUDGE OF THE SUPERIOR COURT

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

8